# Payment of Attorney's Fees in Litigation Involving Successful Challenges to Federal Agency Action Arising Under the Administrative Procedure Act and the Citizen-Suit Provisions of the Endangered Species Act

For purposes of settling attorney's fees claims in a case arising under both section 10 of the Administrative Procedure Act and the citizen-suit provisions of the Endangered Species Act, federal litigators, in allocating hours and costs between the APA-Equal Access to Justice Act and ESA claims, should subordinate EAJA section 2412(d) to ESA section 11(g)(4). Under this approach, hours and costs necessary to both counts should be assigned to the ESA claim for attorney's fees purposes, leaving only the hours and costs necessary only to the APA claim to be paid under EAJA

November 27, 2000

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
ENVIRONMENT AND NATURAL RESOURCES DIVISION

You have asked us to determine how federal litigators, in settling attorney's fees claims in litigation arising under both section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704 (1994), and the citizen-suit provision of the Endangered Species Act ("ESA"), ESA § 11(g), 16 U.S.C. § 1540(g) (1994), should allocate opposing parties' hours and costs between the APA and ESA claims. Fees attributable to APA claims are paid out of agency funds, while fees attributable to ESA section 11(g) claims are paid out of the permanent indefinite appropriation for the payment of judgments against the United States, commonly known as the judgment fund. See 31 U.S.C. § 1304 (1994 & Supp. IV 1998). Accordingly, to settle attorney's fees claims in suits presenting both classes of claims, federal litigators must allocate opposing parties' compensable hours and costs between these two classes in order to determine the amounts of funding to be drawn from agency funds and the judgment fund.

Attorneys in the Wildlife and Marine Resources Section ("Wildlife Section") of the Environment and Natural Resources Division ("ENRD") contacted us in May 1999 concerning the allocation issue posed by their efforts to settle an opponent's fees claim in *Pacific Coast Federation of Fishermen's Assoc. v. National Marine Fisheries Service*, Civ. No. 97–775 (W.D. Wash.) ("the Umpqua River litigation"), a multi-claim suit involving APA and ESA challenges to federal land management decisions affecting the Umpqua River cutthroat trout. In June and July 1999, we provided oral advice concerning the proposed Umpqua River settlement. In December 1999, we provided a brief written summary of our views, which the Wildlife Section had requested as a source of guidance for attorneys in other pending APA-ESA cases. This memorandum responds to your subsequent request for a fuller, more formal statement of our views.

## I. The Payment of Opponents' Attorney's Fees in Multi-claim Litigation Arising under the APA and the ESA

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court found that certain claims challenging agency action designating critical habitat for endangered species were reviewable under the ESA's citizen-suit provision, while related claims concerning agency compliance with ESA data collection requirements were reviewable only under the APA. *See* 520 U.S. at 170–78. Under *Bennett*, suits against federal agencies involved in the administration of the ESA can present related claims arising under the APA and the ESA's citizen-suit provision. The Umpqua River litigation is one such suit. There, federal litigators determined that it would be in the government's interest to settle a multi-claim suit on terms that would afford the plaintiffs substantial relief under one of their five APA claims (count V of the Third Amended Complaint) and under their only ESA citizen-suit claim (count VI). Plaintiffs' claims for attorney's fees and costs were also included in the settlement discussions.

Fee awards for the successful prosecution of APA claims are governed by section 2412(d) of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d) (1994 & Supp. IV 1998). Agencies must pay section 2412(d) judgments out of their own funds. *Id.* § 2412(d)(4). However, agencies may interpose several defenses to section 2412(d) fees claims that are not generally available in other contexts. In particular, an agency can avoid paying EAJA fees, even to a prevailing party, if it can show (1) that the claimant failed to satisfy the EAJA-specific means test for recovery of fees and costs, *see* 28 U.S.C. § 2412(d)(2)(B) (barring recovery by individuals with more than $2 million in net assets and by profit-making enterprises with more than $7 million in net assets or more than 500 employees); (2) that the government's position was substantially justified, *id.* § 2412(d)(1)(A); (3) that special circumstances make an award of attorney's fees unjust, *id.*; or (4) that the claimant failed to file a section 2412(d) petition within 30 days of final judgment, *id.* § 2412(d)(1)(B). *See generally Commissioner v. Jean*, 496 U.S. 154, 158 (1990) (summarizing preconditions to fee-award eligibility under EAJA section 2412(d)). In addition, attorney's fees under EAJA are subject to an hourly cap, currently set at $125 per hour, which can only be exceeded if a court determines "that an increase in the cost of living [since 1996, when the current hourly cap was set] or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." *See* 28 U.S.C. § 2412(d)(2)(A)(ii).

Fee awards for the successful prosecution of ESA citizen-suit claims are governed by section 11(g)(4) of the Act, 16 U.S.C. § 1540(g)(4). Section 11(g)(4) authorizes the award of attorney's fees "whenever the court determines such award is appropriate." The Supreme Court has construed this language to require that at least "some success on the merits be obtained before a party becomes

eligible for a fee award." *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 682 & n.1 (1983). The United States pays section 11(g) attorney's fees out of the judgment fund. *See* 31 U.S.C. § 1304; *see also* 28 U.S.C. §§ 2414, 2517 (1994) (procedures for the payment of judgments). In opposing section 11(g) fees claims, the United States cannot invoke any of the special defenses to liability that exist under EAJA, although special jurisdictional defenses to ESA citizen-suits may be available to defeat fees claims in some cases. *See* ESA § 11(g)(2), 16 U.S.C. § 1540(g)(2). Hourly rates used to determine section 11(g)(4) fees awards are not subject to a statutory cap; they are generally paid at rates that courts determine to be "reasonable" under the circumstances. Accordingly, hours allocated to ESA claims may be compensated at a higher rate than hours allocated to related EAJA claims. *Compare, e.g., Jones v. Espy*, 10 F.3d 690 (9th Cir. 1993) (due to EAJA cap on hourly rates, prevailing plaintiff in litigation against federal and state defendants recovers at a lower rate for hours allocated to the federal claims than for hours allocated to the state claims).

## II. The Allocation of Opposing Attorneys' Hours and Costs Between Their Successful APA and ESA Claims in the Umpqua River Litigation

The Wildlife Section, after deciding to pursue a comprehensive settlement of the Umpqua River litigation, encompassing attorney's fees as well as merits issues, sought our assistance in determining the proper allocation of hours and costs between the APA-EAJA claim set forth in count V of the third amended complaint and the ESA citizen-suit claim set forth in count VI. Additionally, the Wildlife Section pointed out that the Umpqua River plaintiffs had amended their complaint to add count VI after summary judgment motions on the first four APA counts had been fully briefed, and asked whether this relatively late presentation of the ESA citizen-suit claim should affect the allocation of hours and costs in the Umpqua River case.

For the reasons described below, we conclude that the ESA fees provision should take precedence over EAJA section 2412(d) — *i.e.*, that hours and costs necessary to both successful counts should be allocated to the ESA claim for attorney's fees purposes. We also believe that the timing of the ESA count does not necessarily preclude allocation of hours and costs — even hours spent and costs incurred prior to the amendment of the complaint — to the ESA claim.

## A. The Allocation of Hours and Costs Between Successful Claims that Implicate Different Fee-Shifting Provisions

A proper allocation of hours and costs between APA-EAJA and ESA claims for settlement purposes should follow the same analysis that the Department would urge a court to follow in adjudicating the same allocation question. In our view,

a court would properly resolve the fees phase of the Umpqua River litigation (following a judgment for the plaintiffs on counts V and VI) by undertaking a two-stage allocation of hours and costs among the claims that the plaintiffs presented. The court would, first, allocate total hours and costs between successful claims (counts V and VI) and unsuccessful claims (counts I through IV) and, second, allocate hours and costs attributed to the successful claims between count V, which implicates the fee-shifting requirements of EAJA section 2412(d), and count VI, which implicates the requirements of ESA section 11(g)(4). We believe that the proper framework for both stages of this analysis may be found in *Hensley v. Eckerhart*, 461 U.S. 424 (1983).

The allocation of hours and costs between successful and unsuccessful claims calls for a relatively straightforward application of *Hensley v. Eckerhart*. Although *Hensley* was specifically concerned with the allocation of costs and hours between successful and unsuccessful claims in civil rights litigation governed by the fee-shifting provisions of 42 U.S.C. § 1988 (1994 & Supp. IV 1998), the Court indicated that its approach there was "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party,'" 461 U.S. at 433 n.7, and lower courts have relied upon *Hensley* in allocating costs and hours between successful and unsuccessful claims in fees litigation arising under a variety of other fee-shifting statutes.[1] Under *Hensley*, courts determine how much of a fees claimant's work was reasonably necessary to the litigation of the successful claims (that is, how much "involve[d] a common core of facts or [was] based on related legal theories") and whether the degree of success was commensurate with the effort expended. *Id.* at 434–36. If successful and unsuccessful claims were closely related, so that all of the hours and costs at issue contributed to the prosecution of the successful claims, and the claimant's victory on those claims produced significant results, a claimant's costs and hours may be fully compensated. On the other hand, if successful and unsuccessful claims implicated different facts and legal theories, so that identifiable categories of work did not contribute to the prosecution of the successful claims, or if the successful claims achieved only partial or limited relief, appropriate reductions must be made.

Because the proposed Umpqua River settlement would give plaintiffs at least some of the relief sought under two distinct claims that implicate two distinct fee-shifting mechanisms, this case requires a second allocation of costs and hours

---

[1] *See, e.g., George Hyman Constr Co v. Brooks*, 963 F.2d 1532, 1536 (D.C Cir. 1992) (finding that *Hensley* requires allocation between successful and unsuccessful claims in case arising under the Longshore and Harbor Workers' Compensation Act; noting that "lower courts have adopted [*Hensley's*] instructions in a wide array of statutory settings"), *Conservation Law Found. of New England, Inc. v Secretary of the Interior*, 790 F 2d 965, 969–70 (1st Cir. 1986) (work on unsuccessful claims arising under the Outer Continental Shelf Lands Act was sufficiently related to work on successful claims arsing under the National Environmental Policy Act ("NEPA") to justify compensation, although work on unsuccessful ESA claims was insufficiently related to the NEPA claims and should have been excluded from the fees award); *Citizens Council of Delaware County v Brinegar*, 741 F.2d 584, 596 (3d Cir. 1984) ("sufficient interrelationship" existed among successful and unsuccessful NEPA claims for the district court to avoid apportioning hours and costs among claims "based on the success or failure of any particular legal argument advanced by the plaintiffs").

between those two claims — the count V APA claim, fees for which are governed by EAJA section 2412(d), and the count VI citizen-suit claim, fees for which are governed by ESA section 11(g)(4). We believe that a court, in addressing this aspect of the problem, would apply EAJA section 2412(d) only as a fall-back to other fee shifting provisions, such as ESA section 11(g)(4). A court following this approach would, in essence, apply the *Hensley* framework a second time to determine which of the hours and costs attributable to the successful claims were reasonably necessary to the litigation of the non-EAJA claim and allocate only the residual hours and costs to the section 2412(d) fees claim.

Two provisions of EAJA indicate that section 2412(d) should be assigned this secondary role. Section 2412(d)(1)(A) states that the United States may be ordered to pay fees and expenses under section 2412(d), "[e]xcept as otherwise specifically provided by statute." A separate, uncodified provision establishes even more clearly section 2412(d)'s subordinate status, stating that nothing in section 2412(d) "alters, modifies, repeals, invalidates, or supersedes any other provision of Federal law which authorizes an award of such fees and other expenses to any party other than the United States that prevails in any civil action brought by or against the United States." *See* Pub. L. No. 96–481, § 206, 94 Stat. 2321, 2330 (1980), *as amended by* Pub. L. No. 99–80, § 3, 99 Stat. 183, 186 (1985), *reprinted in* 28 U.S.C. § 2412 note (1994). The legislative history of EAJA further supports this reading. In reporting out the bill that became EAJA, the House Judiciary Committee stated that

> [S]ection [2412(d)] is not intended to replace or supercede any existing fee-shifting statutes . . . in which Congress has indicated a specific intent to encourage vigorous enforcement, or to alter the standards or the case law governing those Acts. It is intended to apply only to cases (other than tort cases) where fee awards against the government are not already authorized.

H.R. Rep. No. 96–1418, at 18 (1980). In addition, the Committee observed that section 206 (section 6 of the bill before the Committee) "reinforce[d] the statutory language and emphasize[d] the Congressional intent that the provisions of section 2412(d) . . . shall not supercede or alter existing statutory authority for fee awards against the government." *Id.* at 19; *cf. United States v. 329.73 Acres of Land, Situated in Grenada and Yalobusha Counties, Mississippi,* 704 F.2d 800, 807 (5th Cir. 1983) (en banc) (EAJA section 206 "operates to leave intact the more expansive pre-Act fee-shifting statutes that permit award of attorneys' fees against the government").

Application of the *Hensley* methodology to the second-stage allocation issue presented here is consistent with the courts' extension of *Hensley* to cases involving fee-eligible and fee-ineligible claims. Although *Hensley* involved the

allocation of hours and costs between successful and unsuccessful claims, a number of courts have applied its methodology to allocations between successful fee-eligible and fee-ineligible claims.[2] Following the framework set forth in *Hensley*, these courts have examined whether work on the fee-ineligible claims was reasonably necessary to the prosecution of the fee-eligible claims and whether the results obtained on the fee-eligible claims were commensurate with the expenditures incurred. So too here, we believe that a court would first attribute to the ESA claim all work reasonably related to the prosecution of that claim. Those hours and costs would be evaluated for compensation under the ESA, with payments adjusted in the event that the degree of success was not commensurate with expenditures. Remaining fees and costs would be evaluated for compensation under the more restrictive standards of section 2412(d) of EAJA, subject to the same possibility of reduction for partial or limited success.

In reaching this view of the proper allocation of hours and costs between APA-EAJA and ESA claims, we have considered arguments that sovereign immunity principles require allocation of a greater proportion of a prevailing party's litigation efforts to EAJA-eligible claims. Waivers of sovereign immunity, including waivers of federal immunity to fees awards, are strictly construed in favor of the sovereign. *See Ardestani v. INS*, 502 U.S. 129, 137 (1991) ("The EAJA renders the United States liable for attorney's fees for which it would not otherwise be liable, and thus amounts to a partial waiver of sovereign immunity. Any such waiver must be strictly construed in favor of the United States."); *Ruckleshaus v. Sierra Club*, 463 U.S. at 685–86 (sovereign immunity principles require a narrow construction of the appropriateness standard for fees awards set forth in section 307(f) of the Clean Air Act, which governs fees awards in citizen suits against the United States, as well as against private parties); *In re North*, 94 F.3d 685, 689 (D.C. Cir. 1996) (per curiam) ("Sovereign immunity prevents the award of costs or fees against the United States absent specific statutory authorization."). Because the United States, in defending fees claims under EAJA section 2412(d), can invoke special defenses to liability (including the substantial justification defense and financial eligibility tests for recovery), and a fees cap that are unavailable to it in fees litigation governed by ESA section 11(g), sovereign immunity principles arguably require allocation of the greatest possible proportion of a pre-

[2] *See, e.g., Entertainment Research Group, Inc v. Genesis Creative Group, Inc*, 122 F 3d 1211, 1230–31 (9th Cir. 1997) (upholding, under the test of relatedness established in *Hensley*, district court decision that prevailing defendants were entitled to fees for successful defense against copyright claims but not for successful defenses of unrelated claims to which no fee-shifting statute applied), *cert. denied*, 523 U S 1021 (1998), *Bridges v Eastman Kodak, Co.*, 102 F.3d 56, 59 (2d Cir. 1996) (affirming, under *Hensley*, district court's determination that plaintiff's success justified a full award of fees where plaintiff prevailed on fee-eligible and fee-ineligible claims), *cert denied*, 520 U.S. 1274 (1997), *see also, e.g., Andrews v United States*, 122 F 3d 1367, 1376 (11th Cir 1997) (dictum) (efforts devoted to fee-ineligible tort claim cannot be attributed fee-eligible CERCLA claim); *Mansker v TMG Life Ins. Co.*, 54 F.3d 1322, 1329 (8th Cir. 1995) (plaintiff in ERISA action prosecuting both personal claims, for which fees were not available, and representative claims, for which fees were available, entitled to full recovery because all time was necessary to the fee-eligible claims; analysis conforms to but does not cite *Hensley*)

vailing party's hours and costs to the EAJA-eligible claim rather than the ESA-eligible claim.

This analysis is flawed in two respects. First, allocating litigation effort to non-EAJA claims would not lead to uniformly lower fees awards. In some multi-claim lawsuits, the United States may have jurisdictional defenses to the non-EAJA claims that do not apply to the EAJA claims.[3] Similarly, in some multi-claim lawsuits, liability for fees and costs allocated to non-EAJA claims may be divided among the United States and other, non-federal defendants while liability for fees and costs allocated to the EAJA claims falls solely on the United States. And in some cases fees awarded under the non-EAJA fee-shifting authority may be lower than fees awarded for the same efforts under EAJA because of fee ceilings and other statute-specific restrictions.[4] It would seem a novel application of sovereign immunity doctrine for a court to base the relationship between EAJA and other fee-shifting statutes on a broad and uncertain generalization that the allocation of litigation effort to EAJA claims leads to smaller fee awards. Second, and more fundamentally, even if it were certain that aggregate federal liability for fees would be reduced by an approach that increased the proportion of total hours and costs allocated to EAJA claims, the language of EAJA section 2412(d) would preclude such an approach. EAJA was clearly written to function as a fallback waiver of sovereign immunity. Congress explicitly instructed that section 2412(d) should not be construed to alter or modify other fee-shifting provisions. Allocating effort between non-EAJA and EAJA claims under the *Hensley* rule for successful and unsuccessful claims conforms to this instruction; adjusting this allocation to bring a greater proportion of total effort within the coverage of section 2412(d) would disregard it.

One judicial decision might appear to rely upon sovereign immunity principles to allocate a higher proportion of hours and costs to EAJA than would be proper under the *Hensley* framework. In *Slugocki v. United States*, 816 F.2d 1572, *cert. denied*, 484 U.S. 976 (1987), the Federal Circuit rejected a district court's application of *Hensley*'s relatedness test in a case involving successful EAJA and non-EAJA claims. There, the court of appeals reversed the district court's award of fees in a multi-claim overtime pay suit under fee-shifting provisions of the Fair Labor Standards Act ("FLSA"). Prevailing plaintiffs in the case, a class of Deputy U.S. Marshals, alleged that certain overtime practices of the Marshals Service violated 5 U.S.C. § 5542 prior to 1975 and the FLSA from 1975 onward (following the amendment of the FLSA to bring the Deputy Marshals within its coverage). Although the plaintiffs cited EAJA as well as the FLSA fees provision in their fees application, the trial court awarded fees under the FLSA for the entire suit, concluding that the "FLSA and Title 5 claims were too interrelated to be

---

[3] *See, e g ,* ESA § 11(g)(2)(A)(i), 16 U.S.C § 1540(g)(2)(A)(i) (jurisdictional requirement that citizen plaintiffs provide written notice of their intent to sue at least sixty days before filing complaint)

[4] *See, e.g.,* 42 U S.C § 300aa–15(b) (1994) (fees awards under the Vaccine Act capped at $30,000)

segregated" under the *Hensley* standard. 816 F.2d at 1579 (summarizing district court ruling). The court of appeals reversed, stating that "allowance of attorneys' fees for appellees' Title 5 claims as a part of the FLSA award does not represent strict observance of limitations on the Government's waiver of sovereign immunity." *Id.* The court of appeals implicitly rejected the district court's finding of relatedness and remanded with instructions to "segregate" work performed on the Title 5 and FLSA claims and evaluate the Title 5 work under EAJA.[5]

We interpret the court of appeals' decision in *Slugocki* as merely overturning a trial court's misapplication of *Hensley*'s relatedness standard in the circumstances of a particular lawsuit. Although the decision might also be read to require a different approach to the allocation of hours and costs in litigation involving successful EAJA and non-EAJA claims, we think that this interpretation would be inconsistent with the EAJA's specific instructions concerning the relationship between section 2412(d) and alternative fee-shifting provisions. These provisions, in our view, fully support application of the *Hensley* framework to multi-claim cases involving successful EAJA and non-EAJA claims.

Finally, in arriving at our view of the proper method for allocating hours and expenses between APA-EAJA and ESA citizen-suit fees claims, we have also considered how the allocation method that we have described might affect the financial incentive that section 2412(d) establishes for agencies to ensure that their legal positions are substantially justified. Under most fee-shifting statutes, including ESA section 11(g)(4), awards of fees and expenses against the government are paid from the judgment fund. Awards under EAJA section 2412(d), in contrast, are "paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). The legislative history of section 2412(d)(4) indicates that Congress intended for the payment of fee awards from agency funds to operate as a financial incentive for agencies to avoid legal positions that courts could find to lack substantial justification.[6] Thus, our conclusion that hours and costs should be allo-

---

[5] The court recited a passage from *Hensley* that characterized " 'evaluation of the interrelatedness of several claims within a single lawsuit' " as " 'a task for the district court that had and decided the case,        subject to appellate review for abuse of discretion,' " but distinguished *Hensley* on grounds that "all of the claims in *Hensley* fell within an express waiver of sovereign immunity contained in section 42 U.S C § 1988 " *Id.* (quoting *Hensley*, 461 U.S. at 453–54 (Brennan, J., concurring in part and dissenting in part)). The court of appeals appears to have been unaware that the passage it quoted, which it ascribed to the Supreme Court, was actually part of Justice Brennan's opinion explaining his reasons for concurring in part and dissenting in part

[6] The current language of section 2412(d)(4) originated with the 1985 legislation that revised and reenacted EAJA, which had lapsed in accordance with sunset provisions contained in the original Act. *See* Pub L No 99–80, § 2(d), 99 Stat. 183, 185 (codified at 28 U S C §2412(d)(4) (1994)). The Senate Judiciary Committee explained that the revised language, which clarified that section 2412(d) awards must be paid from agency funds, was intended to "return[ ] the law to the Senate's intent when the bill was originally passed " S Rep. No. 98–586, at 19–20 The Committee's original intentions concerning the funding of section 2412(d) awards were set forth in a 1979 report, which explained that the contemporaneous Senate bill included an agency funding requirement in order to "make the individual agencies and departments accountable for [their] actions." S Rep No. 96–253, at 21 A 1980 House-Senate conference eliminated the original Senate bill's agency funding language, substituting language that made it difficult to determine how Congress intended to fund section 2412(d) awards *See generally Funding of Attorney Fee Awards Under the Equal Access to Justice Act*, 6 Op O.L C 204, 212 (1982) (original Act's funding provisions, although ambiguous, were best understood to require that at least some section 2412(d) awards be paid "from general

cated to APA-EAJA claims only if they were not reasonably necessary to the claimant's prosecution of ESA citizen-suit claims might be questioned on grounds that other approaches to the allocation of hours and costs among claims would strengthen financial incentives for agencies to avoid unjustified positions.

We recognize that other conceivable approaches to the allocation of hours and expenses between EAJA and non-EAJA claims, such as allocation based on rough comparisons of the relative importance of the various claims, might give agencies stronger financial incentives to ensure that their legal positions are substantially justified. It is clear, however, that EAJA did not make the establishment of such incentives the overriding objective of federal law governing fees awards against the United States. Congress, as we have seen, expressly relegated section 2412(d) to a secondary role. Section 2412(d) has no application if Congress has "specifically provided by statute" an alternative fee-shifting scheme for the claim at issue, 28 U.S.C. § 2412(d)(1)(A), and does not operate to "alter[ ], modif[y] repeal[ ], invalidate[ ], or supersede[ ]" any other fee-shifting statute, Pub. L. No. 96–481, § 206, 94 Stat. at 2330 (as amended). In fact, EAJA itself subjected the United States to a wide range of new fees claims that are decided without regard to whether the United States was substantially justified and paid out of the judgment fund when claimants prevail. *See* 28 U.S.C. § 2412(b) (1994) (United States liable for fees and expenses under existing fee-shifting statutes and common-law doctrines "to the same extent that any other party would be liable"). In short, the tendency for the allocation method that we have described to limit the effectiveness of section 2412(d)'s financial incentives on agencies in the context of multiclaim litigation is simply one manifestation of the limited scope that Congress has provided for the operation of section 2412(d).

## B. The Timing of the ESA Claim

The Umpqua River litigation, in addition to requiring elaboration of a general framework for the allocation of hours and costs between APA-EAJA and ESA citizen-suit claims, also posed the question of whether the allocation in this particular case should be affected by the claimant's relatively late presentation of the ESA citizen-suit claim. We were informed that the Third Amended Complaint in the Umpqua River case, which added count VI, was filed after the parties had filed summary judgment briefs on counts I through IV, though before the parties had filed briefs on count V and the district court had ruled on the first five counts. We were asked whether this circumstance should affect the allocation of hours and costs between counts V and VI.

funds appropriated to the agencies against whom awards were entered") The amendment of section 2412(d)(4) in 1985, as explained by the Senate Judiciary Committee's report, was meant to establish the clear emphasis on financial accountability that the Senate had advocated in 1979

There is little discussion of this type of timing issue in reported fee-shifting cases. Our analysis is based primarily on the Supreme Court's consideration of a related question in *Smith v. Robinson*, 468 U.S. 992 (1984). Prevailing plaintiffs in that case initially challenged state officials' refusal to provide certain educational services to a handicapped child under federal and state statutes that did not authorize fee-shifting under the circumstances presented there. Toward the conclusion of trial court proceedings in the case, however, plaintiffs added an equal protection claim and then relied on this claim as the basis for a fee request under 42 U.S.C. § 1988. Plaintiffs did not add the equal protection claim until after they had obtained a Rhode Island Supreme Court ruling establishing their statutory right to the relief they sought. The Court stated that the late-filed equal protection claim had "added nothing to petitioners' [statutory] claims" and should therefore be regarded as having had "nothing to do with plaintiffs' success" on the merits. 468 U.S. at 1009 n.12. Under these circumstances, the Court found, the equal protection claim could not provide the basis for a fees award. *Id.* The Court remarked, however, that claims added before success has been assured on other grounds can serve as the basis for a fee award, stating that "[t]here is, of course, nothing wrong with seeking relief on the basis of certain statutes because those statutes provide for attorney's fees, or with amending a complaint to include claims that provide for attorney's fees." *Id.*; *see also Seybold v. Francis P. Dean, Inc.*, 628 F. Supp. 912, 914 (W.D. Pa. 1986) (holding that a fee-eligible federal claim, though never stated in a complaint, was properly before the court through constructive amendment). We are insufficiently familiar with the facts of the Umpqua River litigation to have a view on the role of count VI in the case. The preceding passage from *Smith*, however, makes clear that hours and costs may be allocated to a claim that is added after litigation is well underway — even if that claim is added for the purpose of establishing a right to fees — provided that the later-filed claim contributes to the plaintiffs' success on the merits, and hours and costs are properly attributable to that claim in accordance with the principles discussed above.

Although *Smith* indicates that hours and costs can be allocated to a fee-eligible claim that is added by amendment, it does not address whether such allocations should include hours and costs expended before the filing of the relevant amended complaint. We recognize that some work performed prior to the introduction of a later-filed fee-eligible claim, at least in some situations, could not reasonably be deemed to "relate" to that claim under the *Hensley* allocation methodology. For example, we do not believe that work performed on a fee-ineligible claim before the claimant could reasonably have anticipated the eventual filing of the later fee-eligible claim can be said to relate to the claim under *Hensley*.[7] Accord-

---

[7] Restrictions on the allocation of pre-filing hours and costs to late-filed fee-eligible claims presumably will not apply to essential pre-filing efforts, such as the factual investigations, research, and drafting that normally precede the filing of a complaint or amended complaint

ingly, we believe that *Hensley* itself places limits on the allocation of early litigation efforts to later-filed fee-eligible claims.

In the present case, however, we are aware of no circumstance that would preclude an allocation of early litigation efforts to count VI of the Umpqua River litigation. Count VI was filed approximately five months after the plaintiffs commenced this action by filing a four-count APA action and a request for emergency injunctive relief. Plaintiffs, however, must have formed plans to file their citizen-suit claim at least two months before the filing date, since ESA section 11(g) requires plaintiffs to provide at least sixty days' notice before filing a citizen-suit. Moreover, we are advised that, in the view of trial counsel for the government, the eventual addition of a citizen-suit claim — following the requisite notice and delay — appears to have been a part of plaintiffs' litigation strategy from the outset. In view of these circumstances, we can find no per se bar to the allocation of previously incurred hours and costs to the later-filed citizen-suit claim in the Umpqua River litigation.

## III. CONCLUSION

Based on the foregoing analysis, we conclude that, in allocating hours and costs between the APA-EAJA and ESA claims in the Umpqua River litigation, federal litigators should subordinate EAJA section 2412(d) to ESA section 11(g)(4). Under this approach, hours and costs necessary to both counts should be assigned to the ESA claim for attorney's fees purposes, leaving only the hours and costs necessary only to the APA claim to be paid under EAJA. We also conclude that the timing of the ESA citizen-suit claim, which was added after significant development of the APA issues had already occurred, does not preclude allocation of hours and costs to the ESA claim, so long as those hours and costs were reasonably necessary to litigation of the ESA claim as well.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*